UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| DAWN MARLESHA HANCHARD, | Case No.: 6:21-cv-688 |
| Plaintiff, | |
| v. | |
| JOHN T. WILCHER, in his official capacity as Sheriff of Chatham County, Georgia, JOHN & JANE DOE SHERIFF'S DEPUTY SUPERVISORS and/or CORRECTIONAL SUPERVISORS (1-10), and JOHN & JANE DOE SHERIFF'S DEPUTIES and/or CORRECTIONAL OFFICERS (1-10), | |
| Defendants. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL
## INJUNCTIVE RELIEF SOUGHT

Plaintiff, DAWN MARLESHA HANCHARD (hereinafter, "Plaintiff" or "Hanchard"), by and through her undersigned attorney, sues Defendants JOHN T. WILCHER, in his official capacity as Sheriff of Chatham County, Georgia, JOHN & JANE DOE SHERIFF'S DEPUTY SUPERVISORS and/or CORRECTIONAL SUPERVISORS (1-10), and JOHN & JANE DOE SHERIFF'S DEPUTIES and/or

CORRECTIONAL OFFICERS (1-10), (hereinafter collectively, the "Defendants"), and avers as follows:

## NATURE OF THE ACTION

1.      This is a federal civil rights case pursuant to 42 U.S.C. § 1983 and under the Eighth and Fourteenth Amendments of the United States Constitution as applied to the states under the United States Constitution's Fourteenth Amendment for the Defendants' individual and collective personal, malicious, and unlawful violations under color of state law of Plaintiff's individual rights.

2.      Defendants committed these unlawful violations of Plaintiff's constitutional and state rights under color of state law in bad faith and with malicious purpose in reckless, wanton, and willful disregard of Plaintiff's human and safety rights.

3.      Plaintiff seeks relief, including declaratory and injunctive relief, compensatory damages of greater than $75,000.00, punitive damages, costs, and attorney's fees, pursuant to 42 U.S.C. § 1988.

4.      All conditions precedent to the filing of this action have been performed.

5.      Pursuant to Ga. Code Ann. § 9-3-33 and Ga. Code Ann. § 15-11-5(b), this action is timely filed.

## PARTIES

6.     Plaintiff is a natural person and resident of Orange County, Florida.

7.     Defendant John T. Wilcher (hereinafter, "Sheriff Wilcher") is a natural person residing in Chatham County, Georgia, and at all times relevant to this action, was the Sheriff of Chatham County, Georgia.

8.     Defendants John & Jane Doe Sheriff's Deputy Supervisors and/or Correctional Supervisor (1-10) (hereinafter, "Unknown Supervisor Defendants"), are individuals in supervisory positions at the Chatham County Sheriff's Office and/or Chatham County Jail, whose names and addresses of residences are unknown as of the date of this filing.[1]

9.     Defendants John & Jane Doe Sheriff's Deputies and/or Correctional Officers (1-10) (hereinafter, "Unknown Actor Defendants"), are individuals in non-supervisory positions at the Chatham County Sheriff's Office and/or Chatham County Jail, whose names and addresses of residences are unknown as of the date of this filing.[2]

---

[1]  The Plaintiff is diligently seeking the relevant information at this time and will seek to amend this complaint once the identities are known.

[2]  The Plaintiff is diligently seeking the relevant information at this time and will seek to amend this complaint once the identities are known.

## VENUE AND JURISDICTION

10.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the Plaintiff is a citizen of Florida and the Defendants are citizens of Georgia, and this case involves claims of over $75,000.00.

11.     This Court also has subject-matter jurisdiction over the Plaintiff's federal law claims, pursuant to 28 U.S.C. §§ 1331 (federal question), and 1343(a)(3) (civil rights).

12.     Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 65.

13.     The Plaintiff is not immediately arguing any Georgia state law tort claims related to these federal claims that may form a part of the same case or controversy, due to conditions precedent to the filing of those claims as set forth in O.C.G.A. § 36-11-1. This Court would have supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a), but cannot bring those claims at this stage, and will reassess at a later time whether to seek leave to amend this Complaint or to pursue those claims in state court.

14.     At all material times, the Defendants committed these unlawful violations under color of state law in bad faith and with malicious purpose in reckless, wanton, and willful disregard of the Plaintiff's human and safety rights.

15.     These constitutional law violations are "capable of repetition, yet evading review." Roe v. Wade, 410 U.S. 113, 125 (1973) (citing Southern Pacific Terminal Co. v. ICC, 219 U. S. 498, 515 (1911), Moore v. Ogilvie, 394 U. S. 814, 816 (1969), Carroll v. Princess Anne, 393 U. S. 175, 178-179 (1968), United States v. W. T. Grant Co., 345 U. S. 629, 632-633 (1953)).

16.     All conditions precedent to the maintenance of this action have been performed, have occurred prior to its institution or have been waived.

## FACTS COMMON TO ALL COUNTS

### A.     An Overview of Certain Medical Concepts Discussed Herein.

17.     "Gender identity" is a well-established medical concept, referring to a person's internal sense of their own gender. All human beings develop this elemental conviction of belonging to a particular gender.

18.     Gender identity is innate and immutable.

19.     Typically, people who are designated female at birth based on their external anatomy identify as girls or women, and people who are designated male at birth identify as boys or men.

20.     For transgender individuals, however, one's gender identity differs from the sex assigned to them at birth. Transgender men are men who were assigned "female" at birth but have a male gender identity. Transgender women are women who were assigned "male" at birth but have a female gender identity.

21.    The medical diagnosis for the incongruence between one's gender identity and one's sex assigned at birth and the clinical distress resulting from this incongruence is Gender Dysphoria (previously known as Gender Identity Disorder).

22.    Gender Dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (hereinafter, the "DSM-5")[3] and International Classification of Diseases-10[4], World Health Organization (1992) (hereinafter, the "ICD-10").

---

[3] The DSM-5 describes the criteria as follows:

Gender Dysphoria in Adolescents and Adults 302.85 (F64.1)

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender(or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

3. A strong desire for the primary and/or secondary sex characteristics of the other gender.

4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Diagnostic and Statistical Manual of Mental Disorders, *American Psychiatric Association*, 452-53 (5th ed. 2013).

[4] International Classification of Diseases-10, *World Health Organization* (1992).

23.    If left untreated, Gender Dysphoria can lead to serious medical problems, including clinically significant psychological distress, dysfunction, debilitating depression, and, for some people without access to appropriate medical care and treatment, self-harm, suicidality, and death.

24.    Leading medical and mental-health professional groups—including the American Medical Association, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Congress of Obstetricians and Gynecologists, the Endocrine Society, the National Association of Social Workers, and the World Professional Association for Transgender Health—all agree that Gender Dysphoria is a serious medical condition, and that treatment for Gender Dysphoria is medically necessary for many transgender people.

25.    The accepted standards of care for treating Gender Dysphoria are published by the World Professional Association for Transgender Health (hereinafter, "WPATH"), a professional association dedicated to establishing the standards for treating Gender Dysphoria.

26.    The WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (hereinafter, the "WPATH Standards of Care") identify clinical guidance for health professionals to assist with safe and effective care for individuals with Gender Dysphoria. Eli Coleman et al.,

*Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, Version 7, World Professional Association for Transgender Health (WPATH) (2012).

27.    The WPATH Standards of Care are recognized by the leading medical and mental-health professional groups as the authoritative standards for treating Gender Dysphoria.

28.    The Standards of Care apply equally to inmates, and expressly state:

> Health care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community. . . . All elements of assessment and treatment as described in the SOC can be provided to people living in institutions. Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care.

> Id., at 67.

29.    The National Commission on Correctional Healthcare ("NCCHC") recommends that the medical management of prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the WPATH Standards of Care. *NCCHC*, "NCCHC Policy Statement, Transgender Health Care in Correctional Settings" (October 18,

2009; *reaffirmed with revision* April 2015), http://www.ncchc.org/transgender-health-care-in-correctional-settings (visited August 14, 2020) (footnote omitted); *see also*, Smith, Brenda K., & Brisbin, Lorie, *PREA Standards and Policy Development Guidelines for Lesbian, Gay, Bisexual, Transgender and Intersex Inmates*, The Project on Addressing Prison Rape – National PREA Resource Center (December 18, 2012)

https://www.prearesourcecenter.org/sites/default/files/library/lgbtiadultwebinarfinaljdi121812.pdf (visited August 14, 2020).

30.    Under the WPATH Standards of Care, treatment for Gender Dysphoria is designed to help individuals live congruently with their gender identity and thus eliminate the clinically significant distress. Treatment protocols include socially transitioning (dressing, grooming, and presenting oneself to others in accordance with one's gender identity), hormone replacement therapy, and surgeries. The particular course of medical treatment varies based on the individualized needs of the person.

31.    Transgender individuals experience discord between their self-identified gender identity and the sex with which they were "assigned" at birth. Transgender men are individuals who were assigned female at birth but identify as men, and transgender women are individuals who were assigned male at birth but

identify as women. *See, ex.*, Unger, Cécile A. (December 2016). "Hormone therapy for transgender patients". *Translational Andrology and Urology*. 5 (6): 877–884.

**B.    Plaintiff's Gender Dysphoria and Treatment.**

32.    At all times relevant to this action, and for several years prior to this action, Plaintiff has been living publicly as a woman, in accordance with her gender dysphoria.

33.    At all times relevant to this action, and for several years prior to this action, Plaintiff has not had access to proper health care for her gender dysphoria.

34.    As a result, and at all times relevant to this action, and for several years prior to this action, Plaintiff has been taking hormone replacement therapy (hereinafter, "HRT" or "hormone therapy") medications without a prescription.

35.    Common effects of HRT medications on transgender women can include the following: growth of female breasts, an emotional sense of well-being, a significantly decreased sexual drive, loss of body hair, reversal of (head) hair loss, loss of muscle mass, redistribution of body fat to a more standard female presentation, and many other positive effects.

36.    However, abrupt withdrawal of HRT medications can cause the following: severe depression, suicide, chest pains, psychosis, mood disorders, autonomic hyperactivity, heart palpitations, and many other serious health issues, as well as a partial reversal of the "feminizing" effects of the HRT.

37.     Due to HRT, the Plaintiff has and had at all relevant times to this case, a completely female presentation, including full-sized female breasts, which require the wearing of female brassieres.

**38.     The Plaintiff's Legal Name is Dawn Marlesha Hanchard.**

39.     The term "Deadname" is used for the prior name of a transgender person before they have transitioned.

40.     The use of a Deadname, especially after the person's name has been legally changed, is not only insulting, but it exposes the person to significant danger, ridicule, and harassment, and serves no lawful purpose.

41.     On May 29, 2015, the Plaintiff filed for a name change in Chatham County case SPCV1500507.

42.     The final decree changing her name was issued by the court on July 10, 2015, and the case was disposed.

43.     Thereafter, her name was legally changed from her Deadname to Dawn Marlesha Hanchard as of July 10, 2015, approximately four (4) years prior to her arrest and incarceration.

44.     As a result, the Plaintiff's Deadname (hereinafter, "Deadname") is not recounted in this pleading but can be transmitted to the Court if needed.

**C.     The Arrest and Incarceration of Dawn Hanchard.**

45.    On or about 2015, the Plaintiff filed an employment discrimination action against her former employer, Dollar General Corporation (hereinafter, "Dollar General"), with the United States Equal Employment Opportunity Commission (hereinafter, the "EEOC").

46.    Approximately a year later, and shortly after the Plaintiff received her "right-to-sue" letter from the EEOC, Dollar General retaliated by filing criminal charges against the Plaintiff, claiming that she had stolen money while employed with them.

47.    On April 19, 2019, the Plaintiff was arrested and incarcerated for a multitude of allegations by Dollar General.

48.    The allegations were later reduced to one count of theft by taking - felony.

49.    The Plaintiff spent approximately over four (4) months at the Chatham County Jail before her bond was reduced and she was able to bond out.

50.    Her total incarceration was from April 17, 2019 to August 24, 2019.

**D.    The Plaintiff at the Chatham County Jail.**

51.    At booking, one Unknown Actor Defendant #1 (a member of the Chatham County Jail staff, herein collectively described as "Jail Staff") was entering the Plaintiff's information into the system under her legal name.

52.     However, another Unknown Actor Defendant #2 interceded and demanded that the staff member to fraudulently and maliciously enter her information under the Plaintiff's Deadname.

53.     There was no legitimate state purpose in booking her under her Deadname, and it was clearly done out of spite and to harass her.

54.     In fact, Unknown Actor Defendant #2 was particularly adamant that the Plaintiff be treated as a "man" and appeared angry and personally offended that the Plaintiff was transgender.

55.     Also during booking, one member of Jail Staff also attempted to give the Plaintiff a bra, given that she has developed large breasts through her transition.

56.     However, Unknown Actor Defendant #3 stepped in and excoriated the Jail Staff for treating the Plaintiff as a woman and ensured that she never received appropriate female undergarments throughout her incarceration.

57.     While the Plaintiff was indeed interviewed by a social worker to discuss transgender issues, it was quite clear that none of the Jail Staff or Unknown Actor Defendants or Unknown Supervisor Defendants would in any way follow up appropriately.

58.     In fact, the Unknown Actor Defendants went out of their way on a daily basis to refer to the Plaintiff as "a man" or "it", and to ensure that she was singled out for mistreatment, solely because she is a transgender woman.

59.     Other inmates were permitted to intimidate, harass, and threaten her with impunity, and when the Plaintiff complained of such behavior, such as when another inmate spit at her through the bars and yelled slurs at her, the Unknown Actor Defendants acted as if the Plaintiff was somehow "responsible" for this aggression because she is a transgender woman.

60.     On multiple instances, the Plaintiff registered official complaints about the Unknown Actor Defendants, but the only consequences of this behavior was intimidation and threats against her by the Unknown Actor Defendants that she had reported.

61.     As a result, the Plaintiff ceased further reporting of the Unknown Actor Defendants, as her safety was in danger.

62.     At no point during her incarceration did any of the Defendants use her legal name, her proper pronouns, or treat her in any way consistent with her being a woman.

63.     **The Plaintiff's Medical and Mental Health Concerns.**

64.     The Plaintiff had been on HRT for many years at the time of her arrest.

65.     The Defendants refused to provide her these medications.

66.     The Defendants also refused to provide her with a medical professional to proscribe these medications.

67.     As a result, the Plaintiff suffered dangerous and medical complications of withdrawal, such as: severe depression, suicide, chest pains, psychosis, mood disorders, autonomic hyperactivity, heart palpitations, and many other serious health issues, as well as a partial reversal of the "feminizing" effects of the HRT.

68.     The Plaintiff asked the Jail Staff mental health professionals for assistance with these symptoms, but they would only check to make sure that she was alive, and then leave.

**E.      The customs, policies, and practices of Defendant Sheriff Wilcher with respect to transgender pre-trial detainees.**

69.     The customs, policies, and practices of the Chatham County Sheriff's Office (hereinafter, "CCSO"), as created and/or implemented by Sheriff Wilcher and the Unknown Supervisor Defendants, constituted moving forces of the unconstitutional conduct that proximately caused the injuries and deprivations of constitutional rights to the Plaintiff.

70.     On information and belief, Defendant Sheriff Wilcher was responsible for the creation and dissemination of the policies, procedures, customs, and practices used and adhered to by the other Defendants in this action.

71.     On information and belief, the actions, omissions, and decisions constituting the majority of the conduct described herein include, but are not limited to, the Unknown Actor Defendants.

72.     On information and belief, the supervisory personnel involved in the ratification, approval, condoning, and endorsement of the Unknown Actor Defendants' actions include, but are not limited to, Sheriff Wilcher and the Unknown Supervisor Defendants.

73.     In fact, the actions, decisions, omissions, and other conduct of Defendants were so widespread and accepted that none of the actions of the Unknown Actor Defendants appear in any way to have been challenged by any of the Unknown Supervisor Defendants or by Sheriff Wilcher throughout the Plaintiff's detainment.

74.     The policies, practices, and/or customs of CCSO constituted moving forces of the unconstitutional conduct that proximately caused the injuries and deprivations of constitutional rights to the Plaintiff.

75.     On information and belief, at the time of the Plaintiff's detainment at the Chatham County Jail, the policies, practices, and customs of CCSO were to treat transgender inmates according to their sex assigned at birth, putting transgender women in jail with men, and transgender men in jail with women.

76.     On information and belief, at the time of the Plaintiff's detainment at the Chatham County Jail, the unwritten policies, practices, and customs of CCSO were to deliberately mistreat transgender inmates through intentional discriminatory actions.

77.    Sheriff Wilcher failed to create, produce, or enact procedures to properly address the needs of certain inmates which are and have been ignored solely because they are transgender.

78.    All of these policies were the moving force of the constitutional violations that resulted in the deprivation of the Plaintiff's (and all other transgender inmates or detainees currently or previously under the control of the Defendants) well-settled Constitutional rights.

79.    Sheriff Wilcher and the Unknown Supervisor Defendants failed to discipline officers who refuse to properly address the needs of certain inmates which are and have been ignored solely because they are transgender.

80.    Sheriff Wilcher and the Unknown Supervisor Defendants failed to properly train officers with respect to the needs of certain inmates which are and have been ignored solely because they are transgender.

81.    The CSCO also has a persistent and widespread practice of denying hormone replacement therapy to transgender detainees and refusing to address the medical dangers of the side effects caused by withdrawal of hormone replacement therapy medications. These practices are so widespread that they constitute a custom that fairly represents municipal policy and are so obvious that they demonstrate Sheriff Wilcher's and the Unknown Supervisor Defendants' deliberate indifference toward transgender detainees' constitutional rights.

82.    The aforementioned customs, policies, practices, and procedures, the failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of Sheriff Wilcher and the Unknown Supervisor Defendants were a moving force and/or a proximate cause of the deprivations of the Plaintiff's clearly established and well settled constitutional rights under the Fourteenth amendment in violation of 42 U.S.C. §1983.

**COUNT I**
**DEPRIVATION OF EQUAL PROTECTION – INJUNCTIVE RELIEF**
**U.S. Const. Amend. XIV**
**(Sheriff Wilcher)**

Plaintiff, DAWN MARLESHA HANCHARD, hereby sues Sheriff Wilcher for purposes of seeking declaratory and injunctive relief pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

83.    Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 80 as though fully set forth herein.

84.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

85.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

86.    It is well settled that "discrimination against a transgender individual because of [his or] her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." Glenn v. Brumby, 663 F.3d 1312, 1317 (11th Cir. 2011); cf. Bostock v. Clayton County, 590 U.S. ——, 140 S. Ct. 1731, 1741, —— L.Ed.2d —— (2020) (confirming that "it is impossible to discriminate against a person for being ... transgender without discriminating against that individual based on sex").

87.    As a result, the policies at issue in this case are subject to review based upon heightened scrutiny. *See, ex.*, Adams by & through Kasper v. Sch. Bd. of St. Johns County, 318 F. Supp. 3d 1293 (M.D. Fla. 2018), aff'd sub nom. Adams by & through Kasper v. Sch. Bd. of St. Johns County, 968 F.3d 1286 (11th Cir. 2020).

88.    Defendant Sheriff Wilcher violated the Plaintiff's Fourteenth Amendment rights by enacting and following policies and practices that cause constitutional violations to transgender people, including the Plaintiff (hereinafter, the "Policies").

89.    The Plaintiff hereby facially challenges the Policies regarding transgender people.

90.    The Policies discriminate against transgender people on the basis of sex, which includes discrimination based on gender nonconformity, gender identity, transgender status, and gender transition.

91.    The Policies facially classify people based on sex, gender identity, and transgender status.

92.    The Policies treat transgender people differently than non-transgender people who are similarly situated.

93.    Under the Policies, non-transgender people are able be assigned to jail housing according to their gender identity, to access restrooms and other single- sex facilities consistent with their gender identity, and to receive medical care consistent with their gender identity, but transgender people are prevented from jail housing consistent with their gender identity, banned from restrooms and other single-sex facilities consistent with their gender identity, and are denied medical care consistent with their gender identity.

94.    The Policies facially discriminate against transgender people based on gender nonconformity. For example, although the Plaintiff is a woman, is perceived as a woman in public, and has had medical treatment to bring her body into alignment with her female gender identity, her birth certificate and other identification documents have "male" gender markers that do not conform to the societal expectations of women. Furthermore, had the Plaintiff been assigned female

at birth, she would not have been excluded from the female housing, from the restrooms and other single-sex facilities consistent with her gender identity, and would have been given the medications consistent with well-established medical guidelines. No person has any control over the sex that person is assigned at birth.

95.    The Policies' discrimination against transgender people based on sex is not substantially related to any important government interest. Indeed, it is not even rationally related to any legitimate government interest.

96.    The Policies endanger the safety, privacy, security, and well-being of transgender individuals. For example, transgender women are highly likely to be harassed, attacked, sexually assaulted, or even murdered by male prisoners who believe that she should not be in the men's housing, restrooms, or other male-only locations of the Jail.

97.    The Policies do not promote the safety, privacy, security, or well-being of non-transgender people.

98.    The Policies deprive transgender people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

99.    The Policies' discrimination against transgender people based on sex denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

100.   Discrimination based upon transgender status warrants heightened scrutiny for the additional following reasons.

101.   Transgender people have suffered a long history of extreme discrimination in Georgia and across the country and continue to suffer such discrimination to this day.

102.   Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination.

103.   A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

104.   Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

105.   Gender identity generally is fixed at an early age and highly resistant to change through intervention.

106.   Qualified immunity does not apply to this case, both because of precedent establishing the rights of transgender people to equal protection (*See, ex.*, Adams, 318 F. Supp. 3d at 1293, aff'd sub nom. Adams, 968 F.3d at 1286), and because it is "obvious" that it is a deprivation of equal protection to treat a

transgender person in the way in which the Plaintiff was treated herein. Hope v. Pelzer, 536 U.S. 730, 731 (2002).

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a. Declaring that the provisions of and enforcement by Defendant Sheriff Wilcher of the Policies as discussed above violate the Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

b. Preliminarily and permanently enjoining enforcement by Defendant Sheriff Wilcher of the Policies as discussed above;

c. Requiring Defendant Sheriff Wilcher in his official capacity to allow individuals, including transgender people, to be assigned to jail housing, and to use single-sex facilities in accordance with their gender identity; and requiring Defendant Sheriff Wilcher in his official capacity to enact and to continue to enforce anti-discrimination protections for transgender people;

d. Awarding the Plaintiff her costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

e. Granting such other and further relief as the Court deems just and proper.

f.  The declaratory and injunctive relief requested in this action is sought against each Defendant; against each Defendant's officers, employees, and agents; and against all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

**COUNT II**
**CRUEL AND UNUSUAL PUNISHMENT – INJUNCTIVE RELIEF**
**U.S. Const. Amend. XIV**
**(All Defendants)**

Plaintiff, DAWN MARLESHA HANCHARD, hereby sues the Sheriff Wilcher, for purposes of seeking declaratory and injunctive relief pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

107.   Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 80 as though fully set forth herein.

108.   The Fourteenth Amendment has been found by U.S. courts to prohibit deliberate indifference to a serious medical need.

109.   However, the standards under the Fourteenth Amendment are identical to those under the Eighth. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007).

110.   In order to prove deliberate indifference to a serious medical need under the Fourteenth Amendment, a prisoner must shoulder three burdens. First, she must

satisfy the objective component by showing that she had a serious medical need. Second, she must satisfy the subjective component by showing that the prison official acted with deliberate indifference to her serious medical need. Third, as with any tort claim, she must show that the injury was caused by the defendant's wrongful conduct. Goebert, 510 F.3d at 1326.

111.   "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,' " Taylor v. Hughes, 920 F.3d 729, 733 (11th Cir. 2019) (quotation omitted), and, in either instance, "that, if left unattended, poses a substantial risk of serious harm," Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).

112.   A deliberate indifference claim entails both an objective and a subjective component. Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).

113.   First, the inmate must establish "an objectively serious medical need"—that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"—that, "if left unattended, poses a substantial risk of serious harm." Id. (alteration adopted) (quotation omitted).

114.   Second, the inmate must prove that prison officials acted with deliberate indifference to that need by showing (1) that they had "subjective knowledge of a risk of serious harm" and (2) that they "disregard[ed]" that risk (3) by conduct that was "more than mere negligence." Id.; Harper v. Lawrence Cty., 592 F.3d 1227, 1234 (11th Cir. 2010); Patel v. Lanier County Georgia, 969 F.3d 1173, 1188 (11th Cir. 2020).

115.   The Fourteenth Amendment applies to prevent jail personnel from acting or failing to act in a manner that shows a deliberate indifference to a pre-trial detainee's serious medical needs. Lancaster v. Monroe Cty., 116 F.3d 1419, 1425 n.6 (11th Cir. 1997).

116.   "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Mann v. Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (internal quotation and citation omitted).

117.   Alternatively, it is one that "is determined by whether a delay in treating the need worsens the condition." Id. The condition "must be one that, if left unattended, poses a substantial risk of serious harm." Id. (internal quotation marks and citation omitted). See, Prescott v. Oakley, 8:16-CV-060-T-27TBM, 2016 WL 8919458, at *4–5 (M.D. Fla. Dec. 6, 2016).

118.   Plaintiff is a transgender woman with Gender Dysphoria, which is universally recognized as a serious medical condition. Keohane v. Georgia Dep't of Corr. Sec'y, 952 F.3d 1257, 1273 (11th Cir. 2020) ("all agree that [a transgender woman's] gender dysphoria constitutes a 'serious medical need' within the meaning of Eighth Amendment precedent").

119.   The decision to deny the Plaintiff hormone therapy was based on an unconstitutional rule with no foundation in medical judgment, and the minimization of the Plaintiff's condition needlessly prolonged her suffering.[5]

120.   Defendant Sheriff Wilcher and his agents, the Unknown Actor Defendants were aware that Plaintiff has Gender Dysphoria and was receiving hormone therapy and expressing her female gender in all aspects of her life prior to her incarceration.

121.   It is medically necessary for Plaintiff to live as female, to receive hormone therapy, and to receive all other treatment for Gender Dysphoria deemed medically necessary by a qualified provider.

122.   Defendants nevertheless refused to provide Plaintiff with hormone therapy or to recommend that she be permitted access to female clothing and

---

[5] See, Keohane v. Jones, 328 F. Supp. 3d 1288, 1305 (N.D. Fla. 2018), vacated sub nom. Keohane v. Georgia Dep't of Corr. Sec'y, 952 F.3d 1257 (11th Cir. 2020) (failing to reach or vacate the issue of the denial of hormone therapy on mootness grounds, since the facility in question reversed its policy after litigation had begun).

grooming standards. This refusal was <u>not</u> based on a medical judgment concerning Plaintiff's medical needs.

123.   As a result of being denied access to female clothing and grooming standards and of being cut off from and denied hormone therapy by Defendants Sheriff Wilcher and his agents, Plaintiff has suffered severe psychological distress and physical harm, including suicidal ideation/suicide attempts.

124.   Defendants were aware that Plaintiff was seeking hormone therapy and access to female clothing and grooming standards to treat her Gender Dysphoria; that proper, necessary medical care for Plaintiff's Gender Dysphoria includes allowing her to live as female and providing her with hormone therapy; and that the denial of this needed medical care caused serious harm to Plaintiff. Yet they deliberately denied her that care.

125.   This denial of treatment constitutes deliberate indifference to a serious medical need in violation of the Fourteenth Amendment.

126.   In the medical community, hormone therapy is the medically recognized, accepted and appropriate treatment for Gender Dysphoria.

127.   Defendants knew of the Plaintiff's Gender Dysphoria, that she was a transgender woman, that she had been on hormone replacement therapy for many years, that she had a continuing medical need for continued hormone replacement therapy, and that she was in severe physical and emotional distress due to the failure

of the Defendants Sheriff Wilcher and his agents, the Unknown Supervisor Defendants and the Unknown Actor Defendants to provide hormone replacement therapy to her.

128.   Defendants knowingly refused to provide the Plaintiff with this medically necessary hormone treatment for her Gender Dysphoria, even though they knew that this was the recognized, accepted, and medically necessary treatment for Gender Dysphoria, and thus were deliberately indifferent to a serious medical need. *See, ex.*, Kothmann v. Rosario, 558 Fed. Appx. 907, 911 (11th Cir. 2014).

129.   The Plaintiff facially challenges the policies that have resulted in this denial of treatment.

130.   At all relevant times, Defendants Sheriff Wilcher and his agents, the Unknown Supervisor Defendants and the Unknown Actor Defendants, were acting under color of state law.

131.   Qualified immunity does not apply to this case, both because of precedent establishing the rights of transgender people to be free from cruel and unusual punishment (Keohane v. Jones, 328 F. Supp. 3d 1288, 1305 (N.D. Fla. 2018), vacated sub nom. on other grounds Keohane v. Georgia Dep't of Corr. Sec'y, 952 F.3d 1257 (11th Cir. 2020)) and because it is "obvious" that it is reckless indifference to treat a transgender person in the way in which the Plaintiff was treated herein. Hope v. Pelzer, 536 U.S. 730, 731 (2002).

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment:

a. Declaring that the Defendant Sheriff Wilcher, through his agents, the Unknown Supervisor Defendants and Unknown Actor Defendants, are denying Plaintiff medically necessary treatment for Gender Dysphoria in violation of the Fourteenth Amendment to the United States Constitution;

b. Enter a permanent injunction directing Defendant Sheriff Wilcher to provide to transgender individuals hormone therapy, access to female clothing and grooming standards, and all other treatment for Gender Dysphoria deemed medically necessary by a qualified professional in the treatment of the condition, including where that individual was undergoing hormone therapy outside of the treatment of such a professional;

c. Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from Defendants pursuant to 42 U.S.C. § 1988; and

d. Award all other relief that this Court deems just and proper.

## COUNT III
## 42 U.S.C. § 1983 – RECKLESS INDIFFERENCE TO PLAINTIFF'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS (MONELL)
### U.S. Const. Amend. XIV
### (Sheriff Wilcher)

Plaintiff, DAWN MARLESHA HANCHARD, hereby sues Sheriff Wilcher, in his official capacity, for purposes of seeking declaratory and injunctive relief pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

132.   Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 80 as though fully set forth herein.

133.   Defendant Sheriff Wilcher's official and unofficial policies and customs encouraged, caused, allowed, and/or enabled the Unknown Actor Defendants and the Unknown Supervisor Defendants to violate Plaintiff's constitutional rights without fear of discipline for those violations. *See*, Monell v. Department of Social Services, 436 U.S. 658 (1978).

134.   Defendant Sheriff Wilcher has not disciplined the Unknown Actor Defendants or the Unknown Supervisor Defendants for their violations of Plaintiff's constitutional rights and therefore has implicitly approved, ratified, or adopted, the Unknown Actor Defendants' and the Unknown Supervisor Defendants' unconstitutional actions, yet Defendant Sheriff Wilcher is responsible for the Unknown Actor Defendants' and the Unknown Supervisor Defendants' supervision, training, and discipline through its policy-making powers and personnel decisions.

135.   There is an obvious need for Defendant Sheriff Wilcher to train all of the Chatham County Jail employees and agents on Fourteenth Amendment rights,

particularly with respect to transgender people. Defendant Sheriff Wilcher has therefore demonstrated a policy of deliberate indifference to such civil rights violations. *See*, City of Canton v. Harris, 489 U.S. 378, 389 (1989).

136.   Defendant Sheriff Wilcher's callous, reckless, wanton, and malicious actions under color of state law before, during, and after the incidents described herein, have caused the Plaintiff to suffer and continue to suffer the damages that the Plaintiff has described.

137.   These deprivations under color of state law are actionable under and may be redressed by 42 U.S.C. § 1983.

138.   Qualified immunity does not apply to this case, both because of precedent establishing the rights of transgender people to equal protection (*See, ex.*, Adams, 318 F. Supp. 3d at 1293, aff'd sub nom. Adams, 968 F.3d at 1286), and to be free from cruel and unusual punishment (Keohane v. Jones, 328 F. Supp. 3d 1288, 1305 (N.D. Fla. 2018), vacated sub nom. on other grounds Keohane v. Georgia Dep't of Corr. Sec'y, 952 F.3d 1257 (11th Cir. 2020)) and because it is "obvious" that it is a deprivation of equal protection and reckless indifference to treat a transgender person in the way in which the Plaintiff was treated herein. Hope v. Pelzer, 536 U.S. 730, 731 (2002).

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a. Direct the entry of judgment for Plaintiff against Defendant Sheriff Wilcher for damages;

b. Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from Defendants pursuant to 42 U.S.C. § 1988; and

c. Award all other relief that this Court deems just and proper.

## COUNT IV
## 42 U.S.C. § 1983 – DEPRIVATION OF PLAINTIFF'S
## CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS - CRUEL AND UNUSUAL PUNISHMENT
### U.S. Const. Amend. XIV
### (Unknown Actor Defendants and the Unknown Supervisor Defendants)

Plaintiff, DAWN MARLESHA HANCHARD, hereby sues the Unknown Actor Defendants and the Unknown Supervisor Defendants, in their individual capacities, for purposes of seeking damages pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

139.   Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 80 as though fully set forth herein.

140.   The Fourteenth Amendment has been found by U.S. courts to prohibit deliberate indifference to a serious medical need.

141.   However, the standards under the Fourteenth Amendment are identical to those under the Eighth. <u>Goebert v. Lee County</u>, 510 F.3d 1312, 1326 (11th Cir. 2007).

142.   In order to prove deliberate indifference to a serious medical need under the Fourteenth Amendment, a prisoner must shoulder three burdens. First, she must satisfy the objective component by showing that she had a serious medical need. Second, she must satisfy the subjective component by showing that the prison official acted with deliberate indifference to her serious medical need. Third, as with any tort claim, she must show that the injury was caused by the defendant's wrongful conduct. <u>Goebert</u>, 510 F.3d at 1326.

143.   "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,' " <u>Taylor v. Hughes</u>, 920 F.3d 729, 733 (11th Cir. 2019) (quotation omitted), and, in either instance, "that, if left unattended, poses a substantial risk of serious harm," <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1307 (11th Cir. 2009) (*quoting* <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003)).

144.   A deliberate indifference claim entails both an objective and a subjective component. <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004).

145.   First, the inmate must establish "an objectively serious medical need"—that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"—that, "if left unattended, poses a substantial risk of serious harm." Id. (alteration adopted) (quotation omitted).

146.   Second, the inmate must prove that prison officials acted with deliberate indifference to that need by showing (1) that they had "subjective knowledge of a risk of serious harm" and (2) that they "disregard[ed]" that risk (3) by conduct that was "more than mere negligence." Id.; Harper v. Lawrence Cty., 592 F.3d 1227, 1234 (11th Cir. 2010); Patel v. Lanier County Georgia, 969 F.3d 1173, 1188 (11th Cir. 2020).

147.   The Fourteenth Amendment applies to prevent jail personnel from acting or failing to act in a manner that shows a deliberate indifference to a pre-trial detainee's serious medical needs. Lancaster v. Monroe Cty., 116 F.3d 1419, 1425 n.6 (11th Cir. 1997).

148.   "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Mann v. Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (internal quotation and citation omitted).

149.   Alternatively, it is one that "is determined by whether a delay in treating the need worsens the condition." Id. The condition "must be one that, if left unattended, poses a substantial risk of serious harm." Id. (internal quotation marks and citation omitted). *See*, Prescott v. Oakley, 8:16-CV-060-T-27TBM, 2016 WL 8919458, at *4–5 (M.D. Fla. Dec. 6, 2016).

150.   Plaintiff is a transgender woman with Gender Dysphoria, which is universally recognized as a serious medical condition. Keohane v. Georgia Dep't of Corr. Sec'y, 952 F.3d 1257, 1273 (11th Cir. 2020) ("all agree that [a transgender woman's] gender dysphoria constitutes a 'serious medical need' within the meaning of Eighth Amendment precedent").

151.   The decision to deny the Plaintiff hormone therapy was based on an unconstitutional rule with no foundation in medical judgment, and the minimization of the Plaintiff's condition needlessly prolonged her suffering.[6]

152.   The Unknown Actor Defendants and the Unknown Supervisor Defendants were aware that Plaintiff has Gender Dysphoria and was receiving hormone therapy and expressing her female gender in all aspects of her life prior to her incarceration.

---

[6] *See*, Keohane v. Jones, 328 F. Supp. 3d 1288, 1305 (N.D. Fla. 2018), vacated sub nom. Keohane v. Georgia Dep't of Corr. Sec'y, 952 F.3d 1257 (11th Cir. 2020) (failing to reach or vacate the issue of the denial of hormone therapy on mootness grounds, since the facility in question reversed its policy after litigation had begun).

153.   It is medically necessary for Plaintiff to live as female, to receive hormone therapy, and to receive all other treatment for Gender Dysphoria deemed medically necessary by a qualified provider.

154.   The Unknown Actor Defendants and the Unknown Supervisor Defendants nevertheless refused to provide Plaintiff with hormone therapy or to recommend that she be permitted access to female clothing and grooming standards. This refusal was not based on a medical judgment concerning Plaintiff's medical needs.

155.   As a result of being denied access to female clothing and grooming standards and of being cut off from and denied hormone therapy by the Unknown Actor Defendants and the Unknown Supervisor Defendants, Plaintiff has suffered severe psychological distress and physical harm, including suicidal ideation/suicide attempts.

156.   The Unknown Actor Defendants and the Unknown Supervisor Defendants were aware that Plaintiff was seeking hormone therapy and access to female clothing and grooming standards to treat her Gender Dysphoria; that proper, necessary medical care for Plaintiff's Gender Dysphoria includes allowing her to live as female and providing her with hormone therapy; and that the denial of this needed medical care caused serious harm to Plaintiff. Yet they deliberately denied her that care.

157.   This denial of treatment constitutes deliberate indifference to a serious medical need in violation of the Fourteenth Amendment.

158.   In the medical community, hormone therapy is the medically recognized, accepted and appropriate treatment for Gender Dysphoria.

159.   The Unknown Actor Defendants and the Unknown Supervisor Defendants knew of the Plaintiff's Gender Dysphoria, that she was a transgender woman, that she had been on hormone replacement therapy for at least three years, that she had a continuing medical need for continued hormone replacement therapy, and that she was in severe physical and emotional distress due to the failure of the Unknown Actor Defendants and the Unknown Supervisor Defendants to provide hormone replacement therapy to her.

160.   The Unknown Actor Defendants and the Unknown Supervisor Defendants knowingly refused to provide the Plaintiff with this medically necessary hormone treatment for her Gender Dysphoria, even though they knew that this was the recognized, accepted, and medically necessary treatment for Gender Dysphoria, and thus were deliberately indifferent to a serious medical need. *See, ex.*, Kothmann v. Rosario, 558 Fed. Appx. 907, 911 (11th Cir. 2014).

161.   The Unknown Actor Defendants and the Unknown Supervisor Defendants repeatedly, willfully, and maliciously deprived the Plaintiff of her Fourteenth Amendment rights by subjecting her to cruel and unusual punishment,

solely because of her transgender status, including, but not limited to: refusal to address or officially recognize the Plaintiff's legal name as recorded by the State of Georgia; refusal to provide hormone therapy treatment or any kind, or even to arrange for a doctor to prescribe the same during her detainment and incarceration; dehumanizing the Plaintiff and refusing to provide any medical aid for her serious, life-threatening, and debilitating withdrawal symptoms directly caused by their refusal to provide Plaintiff with her hormones and other medications; refusal to allow the Plaintiff to wear female undergarments; forcible searches by male officers; and by dehumanizing Plaintiff's gender identity by refusal to acknowledge that she is a woman.

162.   At all relevant times, the Unknown Actor Defendants and the Unknown Supervisor Defendants were acting under color of state law.

163.   These deprivations under color of state law are actionable under and may be redressed by 42 U.S.C. § 1983.

164.   Qualified immunity does not apply to this case, both because of precedent establishing the rights of transgender people to be free from cruel and unusual punishment (Keohane v. Jones, 328 F. Supp. 3d 1288, 1305 (N.D. Fla. 2018), vacated sub nom. on other grounds Keohane v. Georgia Dep't of Corr. Sec'y, 952 F.3d 1257 (11th Cir. 2020)) and because it is "obvious" that it is reckless

indifference to treat a transgender person in the way in which the Plaintiff was treated herein. <u>Hope v. Pelzer</u>, 536 U.S. 730, 731 (2002).

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a.  Direct the entry of judgment for Plaintiff against the Unknown Actor Defendants and the Unknown Supervisor Defendants for damages;

b.  Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from the Unknown Actor Defendants and the Unknown Supervisor Defendants pursuant to 42 U.S.C. § 1988; and

c.  Award all other relief that this Court deems just and proper.

## COUNT V
## 42 U.S.C. § 1983 – DEPRIVATION OF PLAINTIFF'S
## CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS – EQUAL PROTECTION
### U.S. Const. Amend. XIV
### (Unknown Actor Defendants and the Unknown Supervisor Defendants)

Plaintiff, DAWN MARLESHA HANCHARD, hereby sues the Unknown Actor Defendants and the Unknown Supervisor Defendants, in their individual capacities, for purposes of seeking damages pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

165.  Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 80 as though fully set forth herein.

166. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

167. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

168. It is well settled that "discrimination against a transgender individual because of [his or] her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." Glenn v. Brumby, 663 F.3d 1312, 1317 (11th Cir. 2011); cf. Bostock v. Clayton County, 590 U.S. ——, 140 S. Ct. 1731, 1741, —— L.Ed.2d —— (2020) (confirming that "it is impossible to discriminate against a person for being ... transgender without discriminating against that individual based on sex").

169. As a result, the policies at issue in this case are subject to review based upon heightened scrutiny. *See, ex.*, Adams by & through Kasper v. Sch. Bd. of St. Johns County, 318 F. Supp. 3d 1293 (M.D. Fla. 2018), aff'd sub nom. Adams by & through Kasper v. Sch. Bd. of St. Johns County, 968 F.3d 1286 (11th Cir. 2020).

170. The Unknown Actor Defendants and the Unknown Supervisor Defendants violated the Plaintiff's Fourteenth Amendment rights by treating

transgender people differently than non-transgender people who are similarly situated.

171.   The Unknown Actor Defendants and the Unknown Supervisor Defendants assigned non-transgender people to jail housing according to their gender identity, allowed non-transgender people to access restrooms and other single- sex facilities consistent with their gender identity, and allowed non-transgender people to receive medical care consistent with their gender identity, but the Unknown Actor Defendants and the Unknown Supervisor Defendants prevented transgender people (including the Plaintiff) from being assigned jail housing consistent with their gender identity, prohibited transgender people from accessing restrooms and other single-sex facilities consistent with their gender identity, and are denied transgender people medical care consistent with their gender identity.

172.   For example, although the Plaintiff is a woman, is perceived as a woman in public, and has had medical treatment to bring their body into alignment with her female gender identity, her birth certificate and other identification documents have "male" gender markers that do not conform to the societal expectations of women.

173.   Furthermore, had the Plaintiff been assigned female at birth, she would not have been excluded from the female housing, from the restrooms and other single-sex facilities consistent with her gender identity, and would have been given

the medications consistent with well-established medical guidelines. No person has any control over the sex that person is assigned at birth.

174.   The Unknown Actor Defendants' and the Unknown Supervisor Defendants' discrimination against transgender people based on sex is not substantially related to any important government interest. Indeed, it is not even rationally related to any legitimate government interest.

175.   The Unknown Actor Defendants' and the Unknown Supervisor Defendants' discrimination against transgender people based on sex endangers the safety, privacy, security, and well-being of transgender individuals. For example, transgender women are highly likely to be harassed, attacked, sexually assaulted, or even murdered by male prisoners who believe that she should not be in the men's housing, restrooms, or other male-only locations of the Jail.

176.   The Unknown Actor Defendants' and the Unknown Supervisor Defendants' discrimination against transgender people based on sex does not promote the safety, privacy, security, or well-being of non-transgender people.

177.   The Unknown Actor Defendants' and the Unknown Supervisor Defendants' discrimination against transgender people based on sex deprives transgender people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

178.   The Unknown Actor Defendants' and the Unknown Supervisor Defendants' discrimination against transgender people based on sex denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

179.   Discrimination based upon transgender status warrants heightened scrutiny for the additional following reasons.

180.   Transgender people have suffered a long history of extreme discrimination in Georgia and across the country and continue to suffer such discrimination to this day.

181.   Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination.

182.   A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

183.   Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

184.   Gender identity generally is fixed at an early age and highly resistant to change through intervention.

185. However, the Unknown Actor Defendants and the Unknown Supervisor Defendants repeatedly, willfully, and maliciously deprived the Plaintiff of her Fourteenth Amendment rights by subjecting her to completely different standards than similarly situated non-transgender women, solely because of her transgender status, including, but not limited to: refusal to address or officially recognize the Plaintiff's legal name as recorded by the State of Georgia; removal of her female undergarments by male Chatham County Jail employees; refusal to allow the Plaintiff to wear female undergarments; dehumanizing the Plaintiff and refusing to provide any medical aid for her serious and debilitating withdrawal symptoms caused by their refusal to provide Plaintiff with her hormones and other medications; forcible searches by male officers; and by dehumanizing Plaintiff's gender identity by refusal to acknowledge that she is a woman.

186. These deprivations under color of state law are actionable under and may be redressed by 42 U.S.C. § 1983.

187. Qualified immunity does not apply to this case, both because of precedent establishing the rights of transgender people to equal protection (*See, ex.*, Adams, 318 F. Supp. 3d at 1293, aff'd sub nom. Adams, 968 F.3d at 1286), and because it is "obvious" that it is a deprivation of equal protection to treat a transgender person in the way in which the Plaintiff was treated herein. Hope v. Pelzer, 536 U.S. 730, 731 (2002).

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a.  Direct the entry of judgment for Plaintiff against the Unknown Actor Defendants and the Unknown Supervisor Defendants for damages;

b.  Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from the Defendants pursuant to 42 U.S.C. § 1988; and

c.  Award all other relief that this Court deems just and proper.

## COUNT VI
## 42 U.S.C. § 1983 – DEPRIVATION OF PLAINTIFF'S
## CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS – EQUAL PROTECTION
### U.S. Const. Amend. XIV
### (Sheriff Wilcher and the Unknown Supervisor Defendants)

Plaintiff, DAWN MARLESHA HANCHARD, hereby sues the Supervisory Defendants (Sheriff Wilcher and the Unknown Supervisor Defendants), in their individual and official capacities, for purposes of seeking damages pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

188.   Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 80 as though fully set forth herein.

189.   The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any

person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

190.   Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

191.   It is well settled that "discrimination against a transgender individual because of [his or] her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." Glenn v. Brumby, 663 F.3d 1312, 1317 (11th Cir. 2011); cf. Bostock v. Clayton County, 590 U.S. ——, 140 S. Ct. 1731, 1741, —— L.Ed.2d —— (2020) (confirming that "it is impossible to discriminate against a person for being ... transgender without discriminating against that individual based on sex").

192.   As a result, the actions at issue in this case are subject to review based upon heightened scrutiny. *See, ex.*, Adams by & through Kasper v. Sch. Bd. of St. Johns County, 318 F. Supp. 3d 1293 (M.D. Fla. 2018), aff'd sub nom. Adams by & through Kasper v. Sch. Bd. of St. Johns County, 968 F.3d 1286 (11th Cir. 2020).

193.   The Unknown Supervisory Defendants violated the Plaintiff's Fourteenth Amendment rights by ratifying, condoning, and approving of the

Unknown Actor Defendants' and the Unknown Supervisor Defendants'[7] actions in treating transgender people differently than non-transgender people who are similarly situated.

194.   Sheriff Wilcher and the Unknown Supervisor Defendants approved, ratified, and condoned the actions and procedures of the Unknown Actor Defendants and the Unknown Supervisor Defendants, which assigned non-transgender people to jail housing according to their gender identity, allowed non-transgender people to access restrooms and other single- sex facilities consistent with their gender identity, and allowed non-transgender people to receive medical care consistent with their gender identity, but the Unknown Actor Defendants and the Unknown Supervisor Defendants prevented transgender people (including the Plaintiff) from being assigned jail housing consistent with their gender identity, prohibited transgender people from accessing restrooms and other single-sex facilities consistent with their gender identity, and are denied transgender people medical care consistent with their gender identity.

195.   For example, although the Plaintiff is a woman, is perceived as a woman in public, and has had medical treatment to bring their body into alignment with her female gender identity, her birth certificate and other identification

---

[7] In some cases, the relevant Defendants would come under both the categories of "Unknown Actor Defendants" and "Unknown Supervisor Defendants", depending upon the circumstances.

documents have "male" gender markers that do not conform to the societal expectations of women.

196.   Furthermore, had the Plaintiff been assigned female at birth, she would not have been excluded from the female housing, from the restrooms and other single-sex facilities consistent with her gender identity, and would have been given the medications consistent with well-established medical guidelines. No person has any control over the sex that person is assigned at birth.

197.   Sheriff Wilcher and the Unknown Supervisor Defendants approved, ratified, and condoned the Unknown Actor Defendants' and the Unknown Supervisor Defendants' discrimination against transgender people based on sex, and it is not substantially related to any important government interest. Indeed, it is not even rationally related to any legitimate government interest.

198.   Sheriff Wilcher and the Unknown Supervisor Defendants approved, ratified, and condoned the Unknown Actor Defendants' and the Unknown Supervisor Defendants' discrimination against transgender people based on sex, and it endangers the safety, privacy, security, and well-being of transgender individuals. For example, transgender women are highly likely to be harassed, attacked, sexually assaulted, or even murdered by male prisoners who believe that she should not be in the men's housing, restrooms, or other male-only locations of the Jail.

199.   Sheriff Wilcher and the Unknown Supervisor Defendants approved, ratified, and condoned the Unknown Actor Defendants' and the Unknown Supervisor Defendants' discrimination against transgender people based on sex, and it does not promote the safety, privacy, security, or well-being of non-transgender people.

200.   Sheriff Wilcher and the Unknown Supervisor Defendants approved, ratified, and condoned the Unknown Actor Defendants' and the Unknown Supervisor Defendants' discrimination against transgender people based on sex, and it deprives transgender people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

201.   Sheriff Wilcher and the Unknown Supervisor Defendants approved, ratified, and condoned the Unknown Actor Defendants' and the Unknown Supervisor Defendants' discrimination against transgender people based on sex, and it denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

202.   Discrimination based upon transgender status warrants heightened scrutiny for the additional following reasons.

203.   Transgender people have suffered a long history of extreme discrimination in Georgia and across the country and continue to suffer such discrimination to this day.

204.   Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination.

205.   A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

206.   Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

207.   Gender identity generally is fixed at an early age and highly resistant to change through intervention.

208.   However, Sheriff Wilcher and the Unknown Supervisor Defendants approved, ratified, and condoned the Unknown Actor Defendants' and the Unknown Supervisor Defendants' discrimination against transgender people based on sex as they repeatedly, willfully, and maliciously deprived the Plaintiff of her Fourteenth Amendment rights by subjecting her to completely different standards than similarly situated non-transgender women, solely because of her transgender status, including, but not limited to: refusal to address or officially recognize the Plaintiff's legal name as recorded by the State of Georgia; refusal to allow the Plaintiff to wear female undergarments; dehumanizing the Plaintiff; refusing to provide any medical aid for

her serious and debilitating withdrawal symptoms caused by their refusal to provide Plaintiff with her hormones and other medications; forcible searches by male officers; and by dehumanizing Plaintiff's gender identity by refusal to acknowledge that she is a woman.

209.   These deprivations under color of state law are actionable under and may be redressed by 42 U.S.C. § 1983.

210.   These deprivations were committed under color of state law and are actionable under and may be redressed by 42 U.S.C. § 1983.

211.   Qualified immunity does not apply to this case, both because of precedent establishing the rights of transgender people to equal protection (*See, ex.*, Adams, 318 F. Supp. 3d at 1293, aff'd sub nom. Adams, 968 F.3d at 1286), and because it is "obvious" that it is a deprivation of equal protection to treat a transgender person in the way in which the Plaintiff was treated herein. Hope v. Pelzer, 536 U.S. 730, 731 (2002).

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a. Direct the entry of judgment for Plaintiff against Defendants Sheriff Wilcher and the Unknown Supervisor Defendants for damages;

b. Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from the Defendants pursuant to 42 U.S.C. § 1988; and

c.  Award all other relief that this Court deems just and proper.

## COUNT VII
## 42 U.S.C. § 1983 – DEPRIVATION OF PLAINTIFF'S
## CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS – CRUEL AND UNUSUAL PUNISHMENT
### U.S. Const. Amend. XIV
### (Sheriff Wilcher and Unknown Supervisor Defendants)

Plaintiff, DAWN MARLESHA HANCHARD, hereby sues Sheriff Wilcher and the Unknown Supervisor Defendants for purposes of seeking damages pursuant to the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and alleges:

212.   Plaintiff repeats and reavers each and every allegation of paragraphs 1 through 80 as though fully set forth herein.

213.   The Fourteenth Amendment has been found by U.S. courts to prohibit deliberate indifference to a serious medical need.

214.   However, the standards under the Fourteenth Amendment are identical to those under the Eighth. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007).

215.   In order to prove deliberate indifference to a serious medical need under the Fourteenth Amendment, a prisoner must shoulder three burdens. First, she must satisfy the objective component by showing that she had a serious medical need. Second, she must satisfy the subjective component by showing that the prison

official acted with deliberate indifference to her serious medical need. Third, as with any tort claim, she must show that the injury was caused by the defendant's wrongful conduct. Goebert, 510 F.3d at 1326.

216.  "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,' " Taylor v. Hughes, 920 F.3d 729, 733 (11th Cir. 2019) (quotation omitted), and, in either instance, "that, if left unattended, poses a substantial risk of serious harm," Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).

217. A deliberate indifference claim entails both an objective and a subjective component. Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).

218.  First, the inmate must establish "an objectively serious medical need"—that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention"—that, "if left unattended, poses a substantial risk of serious harm." Id. (alteration adopted) (quotation omitted).

219.  Second, the inmate must prove that prison officials acted with deliberate indifference to that need by showing (1) that they had "subjective knowledge of a risk of serious harm" and (2) that they "disregard[ed]" that risk (3)

by conduct that was "more than mere negligence." <u>Id.</u>; <u>Harper v. Lawrence Cty.</u>, 592

F.3d 1227, 1234 (11th Cir. 2010); <u>Patel v. Lanier County Georgia</u>, 969 F.3d 1173,

1188 (11th Cir. 2020).

220.   The Fourteenth Amendment applies to prevent jail personnel from

acting or failing to act in a manner that shows a deliberate indifference to a pre-trial

detainee's serious medical needs. <u>Lancaster v. Monroe Cty.</u>, 116 F.3d 1419, 1425

n.6 (11th Cir. 1997).

221.   "A serious medical need is one that has been diagnosed by a physician

as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." <u>Mann v. Taser Intern., Inc.</u>, 588

F.3d 1291, 1307 (11th Cir. 2009) (internal quotation and citation omitted).

222.   Alternatively, it is one that "is determined by whether a delay in treating

the need worsens the condition." <u>Id.</u> The condition "must be one that, if left

unattended, poses a substantial risk of serious harm." <u>Id.</u> (internal quotation marks

and citation omitted). *See*, <u>Prescott v. Oakley</u>, 8:16-CV-060-T-27TBM, 2016 WL

8919458, at *4–5 (M.D. Fla. Dec. 6, 2016).

223.   Plaintiff is a transgender woman with Gender Dysphoria, which is

universally recognized as a serious medical condition. <u>Keohane v. Georgia Dep't of</u>

<u>Corr. Sec'y</u>, 952 F.3d 1257, 1273 (11th Cir. 2020) ("all agree that [a transgender

woman's] gender dysphoria constitutes a 'serious medical need' within the meaning of Eighth Amendment precedent").

224.   The decision to deny the Plaintiff hormone therapy was based on an unconstitutional rule with no foundation in medical judgment, and the minimization of the Plaintiff's condition needlessly prolonged her suffering.[8]

225.   Sheriff Wilcher and the Unknown Supervisor Defendants were aware that Plaintiff has Gender Dysphoria and was receiving hormone therapy and expressing her female gender in all aspects of her life prior to her incarceration.

226.   It is medically necessary for Plaintiff to live as female, to receive hormone therapy, and to receive all other treatment for Gender Dysphoria deemed medically necessary by a qualified provider.

227.   Sheriff Wilcher and the Unknown Supervisor Defendants nevertheless approved, ratified, and condoned the Unknown Actor Defendants' and the Unknown Supervisor Defendants' refusal to provide Plaintiff with hormone therapy or to recommend that she be permitted access to female clothing and grooming standards. This refusal was not based on a medical judgment concerning Plaintiff's medical needs.

---

[8] *See*, Keohane v. Jones, 328 F. Supp. 3d 1288, 1305 (N.D. Fla. 2018), vacated sub nom. Keohane v. Georgia Dep't of Corr. Sec'y, 952 F.3d 1257 (11th Cir. 2020) (failing to reach or vacate the issue of the denial of hormone therapy on mootness grounds, since the facility in question reversed its policy after litigation had begun).

228.   As a result of being denied access to female clothing and grooming standards and of being cut off from and denied hormone therapy by the Defendants, Plaintiff has suffered severe psychological distress and physical harm, including suicidal ideation/suicide attempts.

229.   Sheriff Wilcher and the Unknown Supervisor Defendants were aware that Plaintiff was seeking hormone therapy and access to female clothing and grooming standards to treat her Gender Dysphoria; that proper, necessary medical care for Plaintiff's Gender Dysphoria includes allowing her to live as female and providing her with hormone therapy; and that the denial of this needed medical care caused serious harm to Plaintiff. Yet they deliberately denied her that care.

230.   This denial of treatment constitutes deliberate indifference to a serious medical need in violation of the Fourteenth Amendment.

231.   In the medical community, hormone therapy is the medically recognized, accepted and appropriate treatment for Gender Dysphoria.

232.   Sheriff Wilcher and the Unknown Supervisor Defendants knew of the Plaintiff's Gender Dysphoria, that she was a transgender woman, that she had been on hormone replacement therapy for at least three years, that she had a continuing medical need for continued hormone replacement therapy, and that she was in severe physical and emotional distress due to the failure of the Defendants to provide hormone replacement therapy to her.

233.   Sheriff Wilcher and the Unknown Supervisor Defendants knowingly approved, ratified, and condoned the Unknown Actor Defendants' refusal to provide the Plaintiff with this medically necessary hormone treatment for her Gender Dysphoria, even though they knew that this was the recognized, accepted, and medically necessary treatment for Gender Dysphoria, and thus were deliberately indifferent to a serious medical need. *See, ex.*, Kothmann v. Rosario, 558 Fed. Appx. 907, 911 (11th Cir. 2014).

234.   Sheriff Wilcher and the Unknown Supervisor Defendants repeatedly, willfully, and maliciously deprived the Plaintiff of her Fourteenth Amendment rights by approving, ratifying, or adopting, the Unknown Actor Defendants' and the Unknown Supervisor Defendants' unconstitutional actions in repeatedly, willfully, and maliciously depriving the Plaintiff of her Fourteenth Amendment rights by subjecting her to cruel and unusual punishment, solely because of her transgender status, including, but not limited to: refusal to address or officially recognize the Plaintiff's legal name as recorded by the State of Georgia; refusal to provide hormone therapy treatment or any kind, or even to arrange for a doctor to prescribe the same during her detainment and incarceration; dehumanizing the Plaintiff and refusing to provide any medical aid for her serious, life-threatening, and debilitating withdrawal symptoms directly caused by their refusal to provide Plaintiff with her hormones and other medications; removal of her female undergarments by male

Chatham County Jail employees; refusal to allow the Plaintiff to wear female undergarments; forcible searches by male officers; and by dehumanizing Plaintiff's gender identity by refusal to acknowledge that she is a woman.

235.   At all relevant times, Sheriff Wilcher and the Unknown Supervisor Defendants were acting under color of state law.

236.   These deprivations were committed under color of state law and are actionable under and may be redressed by 42 U.S.C. § 1983.

237.   Qualified immunity does not apply to this case, both because of precedent establishing the rights of transgender people to be free from cruel and unusual punishment (Keohane v. Jones, 328 F. Supp. 3d 1288, 1305 (N.D. Fla. 2018), vacated sub nom. on other grounds Keohane v. Georgia Dep't of Corr. Sec'y, 952 F.3d 1257 (11th Cir. 2020)) and because it is "obvious" that it is reckless indifference to treat a transgender person in the way in which the Plaintiff was treated herein. Hope v. Pelzer, 536 U.S. 730, 731 (2002).

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

a.  Direct the entry of judgment for Plaintiff against Defendants Sheriff Wilcher and the Unknown Supervisor Defendants for damages;

b.  Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from the Defendants pursuant to 42 U.S.C. § 1988; and

c.  Award all other relief that this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby requests a trial by jury on all issues triable by jury.

Dated:        19 APRIL 2021.

Respectfully Submitted,

_____

ROOK ELIZABETH RINGER, ESQ.
Florida Bar No. 1015698
LENTO LAW GROUP, P.A.
222 San Marco Ave., Ste. C
St. Augustine, FL 32084
904.602.9400 (Office)
904.299.5400 (Fax)
reringer@lentolawgroup.com
*Attorney for Plaintiff*